**RODIRIECUS L., by BETTY H., his natural parent and next friend, Plaintiffs,**

v.

**WAUKEGAN SCHOOL DISTRICT NO. 60, and Alan Brown, in his official capacity as Superintendent of District 60, Defendants.**

No. 95 C 1275.

United States District Court, N.D. Illinois, Eastern Division.

May 31, 1995.

Marcia Sasaki Pierce, Prairie State Legal Services, Inc., Waukegan, IL and David Wol-

owitz, Mark Reyes, Prarie State Legal Services Inc., Wheaton, IL, for plaintiffs.

Thomas A. Morris, Jr., George E. Riseborough, and Monica Justine Conrad, Brydges, Riseborough, Morris, Franke & Miller, Chicago, IL for defendants.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Plaintiffs, Rodiriecus L. ("Rodiriecus") and Betty H. ("Betty H."), seek a preliminary injunction enjoining defendants, Waukegan School District No. 60 (the "School District") and Alan Brown, from expelling Rodiriecus pending the outcome of administrative procedures initiated to determine whether Rodiriecus is eligible for special education. Plaintiffs claim that an injunction is commanded by the "stay-put" provision of the Individuals with Disabilities Education Act (the "IDEA" or "Act"), 20 U.S.C. § 1415(e)(3), which requires that a child must remain in his current educational placement during the pendency of any proceeding conducted pursuant to the statute. I previously granted plaintiffs' motion for a temporary restraining order. For the reasons stated herein, plaintiffs' motion for a preliminary injunction is granted.

### Facts

Rodiriecus, nicknamed Willie, is a thirteen-year old student in the seventh grade. Since October 13, 1994, he has been enrolled in the regular education program at Abbott Middle School in Waukegan School District No. 60.[1] Rodiriecus attended Greenwood Elementary School, also in the Waukegan School District, for fourth and fifth grades, and a school in Lake Villa Community Consolidated School District 41 for sixth grade and the beginning of seventh grade.

On August 4, 1993, Rodiriecus was placed under the guardianship of the Illinois Department of Children and Family Services ("DCFS") after a juvenile court disposition based on his admission of "Robbery and violation of probation (Burglary)." In May, 1994, Patricia Redpath of Park City, Illinois was appointed Rodiriecus' surrogate parent. DCFS placed Rodiriecus in the custody and care of his mother, Betty H., in October, 1994. School records indicate that Rodiriecus was living with his mother by the time he began attending Abbott Middle School.

From the autumn of 1993 through the present, the Community Alternative Renewal Experience ("CARE"), a private non-school program, has been providing educational and behavioral services to Rodiriecus. In April, 1994, a CARE caseworker requested that Lake Villa School District perform a special education case study evaluation of Rodiriecus. This evaluation was not completed for reasons unknown to the litigants.

Rodiriecus' January 19, 1995 report card indicates that he received the following grades at Abbott Middle School: an "I" (for Incomplete) and a "B" in Health; two "Bs" in Physical Education; two "Fs" in Science; a "D" and an "F" in Math; a "C" and an "F" in Communications; an "I" in Social Studies; and a "C" in Art. A progress report issued on September 23, 1994 indicates that Rodiriecus was missing several assignments.

Rodiriecus was cited for misbehavior on four occasions between October, 1994 and February, 1995. First, on November 2, 1994, following an incident of insubordination in sixth period communications class, Rodiriecus was sent to the school's alternative learning center for the balance of the school day. The communications teacher noted in her report of the insubordination that "Willie and his sister, Tiffany, seem so angry at everyone. Treating them with respect and patience doesn't touch them in any way."

On November 18, 1994, Rodiriecus was suspended for the remainder of the school day after two incidents of insubordination involving Rodiriecus' refusal to comply with faculty members' instructions in gym class and in the hallway. On December 8, 1994, Rodiriecus was again sent to the alternative learning center for the rest of the day because he was too talkative in his communications class. The teacher's referral report stated that "Willie cannot keep himself under control—so that the rest of us can get our work done."

---

**1.** The school year actually began in August, 1994.

On January 25, 1995, Rodiriecus was again cited for misbehavior when a teacher and a school security guard found him in possession of a master key to the school building. Rodiriecus was turned over to the custody of the Waukegan police. On January 26, 1995, Billy Franklin, the Assistant Principal of Abbott Middle School, suspended Rodiriecus for ten school days for alleged multiple thefts.

On February 15, 1995, DCFS requested a special education case study evaluation of Rodiriecus based on its opinion that Rodiriecus suffers from a behavior disorder. The next day, Rodiriecus' attorneys delivered to the School Board a letter requesting a Level I due process hearing. In a letter dated February 17, 1995, Myron T. Dagley, Associate Superintendent for Special Education Services, responded that the Waukegan School District had not known of DCFS' involvement or its right to act on behalf of Rodiriecus. He refused to consider DCFS' request for an evaluation, saying that only a surrogate parent can authorize an evaluation when a public agency is a child's guardian.

Following Rodiriecus' ten-day suspension from school, the School District sought to expel Rodiriecus for the remainder of the school year in connection with the alleged multiple thefts. An expulsion hearing was scheduled for February 16, 1995 but was continued to the following day after Rodiriecus' counsel objected to being denied access to Rodiriecus' academic records.

Over objection by Rodiriecus' counsel,[2] the hearing resumed on February 17, 1995. The hearing officer submitted a summary of the evidence presented at the hearing to the Board of Education. The Board of Education convened a special meeting on February 20, 1995 to consider Rodiriecus' case and

voted to expel Rodiriecus for the balance of the 1994–95 school year.[3]

Notwithstanding the Board's decision to expel Rodiriecus, the School District decided to perform a special education case study evaluation in response to DCFS' request. The Illinois State Board of Education appointed Mary Lou Berger as surrogate parent. At the School District's request, Betty H., Rodiriecus' mother, also executed a parental consent for special education testing.[4] The School District completed its evaluation of Rodiriecus in April, 1995, concluding that Rodiriecus is not eligible for special education and related services. Rodiriecus is obtaining an independent evaluation, as authorized by the Act and the accompanying regulations.

Rodiriecus has also requested a Level I due process hearing. The parties have selected the hearing officer, but a hearing date has not been set.

## The Individuals With Disabilities Education Act

The Individuals With Disabilities Education Act, 20 U.S.C. § 1400 et seq., was enacted "to ensure that children with disabilities receive an education that is both appropriate and free." Dell v. Board of Education, Township High School District 113, 32 F.3d 1053, 1055 (7th Cir.1994) (quoting Florence County Sch. Dist. Four v. Carter, —— U.S. ——, ——, 114 S.Ct. 361, 365, 126 L.Ed.2d 284 (1993)). The Act provides federal funds to "assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law." 20 U.S.C. § 1400(b)(9). In return for receiving federal money, states must adhere to IDEA's procedures assuring disabled children an ed-

---

2. The objection was based in part on the position set forth in this case, i.e., that Rodiriecus' stay-put rights under the IDEA prevented the School District from expelling him. In Re: Rodiriecus L.[], Transcript of Proceedings on February 17, 1995, pp. 12–13.

3. Rodiriecus has not been expelled because of the temporary restraining order entered in this case.

4. DCFS' petition for an evaluation was the only petition filed on Rodiriecus' behalf prior to his expulsion hearing. The defendants maintain that the IDEA stay-put provision could never be applicable because the DCFS was not authorized to seek an evaluation on Rodiriecus' behalf. This argument is unpersuasive; it is undisputed that DCFS is Rodiriecus' legal guardian, and Rodiriecus' mother signed a consent for the evaluation at defendants' request. See 20 U.S.C. § 1415(b)(1)(A); 34 C.F.R. § 300.503.

ucation at public expense. 20 U.S.C. § 1412; *Dell v. Board of Education, Township High School District 113, supra,* 32 F.3d at 1055 (citing *Hendrick Hudson Dist. Board of Educ. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982)).

Section 1415 of IDEA contains detailed procedural safeguards to guarantee children with disabilities an appropriate education. These safeguards include the right to educational evaluations of the child and to formal Level I and Level II hearings to challenge the outcome of the evaluations. Section 1415(e)(3), the "stay-put" provision, is the procedural check at issue in this case. That provision states that during the pendency of any proceedings initiated under the Act, unless the State or local educational agency and the parents or guardian of a child otherwise agree, "the child shall remain in the then current educational placement." 20 U.S.C. § 1415(e)(3).

■ Plaintiffs contend that during the pendency of the independent evaluation, the Level I due process hearing, and any further due process administrative hearings, Section 1415(e)(3) prohibits the School District from expelling Rodiriecus because an expulsion for more than ten days is a change of placement.[5]

### The Applicability of the Act

Defendants argue that IDEA, including Section 1415(e)(3), does not apply to Rodiriecus because he has not yet been identified as a disabled child. They also argue that his "then current educational placement" at the time he invoked the IDEA process was "suspended" or "expelled."

■ In passing IDEA, Congress found that

(1) there are more than eight million children with disabilities in the United States today;

(2) the special education needs of such children are not being fully met;

(3) more than half of the children with disabilities in the United States do not receive appropriate educational services which would enable them to have full equality of opportunity; and

. . . . .

(5) there are many children with disabilities throughout the United States participating in regular school programs whose disabilities prevent them from having a successful educational experience because their disabilities are undetected.

20 U.S.C. § 1400(b). One of the purposes of the Act is to overcome the problem of undetected disabilities that prevent children from "having a successful educational experience." 20 U.S.C. § 1400(b)(5). The Act also is intended to prevent schools from excluding students with disabilities as a substitute for providing them with appropriate educational services. *Hacienda La Puente Unified School District of Los Angeles v. Honig,* 976 F.2d 487, 492 (9th Cir.1992).

To accomplish its goals, the Act requires states to provide an opportunity to present complaints regarding "any matter relating to the *identification,* evaluation, or educational placement of the child." 20 U.S.C. § 1415(b)(1)(E) (emphasis added). States must insure that once such complaints are submitted, there is an opportunity for "an impartial due process hearing." 20 U.S.C. 1415(b)(2). The federal regulations issued pursuant to IDEA also state that a parent or public educational agency may obtain a hearing when a school district refuses to initiate or change the *identification,* evaluation or educational placement of the child. 34 C.F.R. § 300.506(a) (emphasis added). These provisions clearly authorize children who are not yet identified as disabled to invoke the IDEA evaluation and due process hearing procedures.

IDEA defines "children with disabilities" to include children "with ... serious emotional disturbance ... who, by reason there-

---

5. The usual standards for issuing a preliminary injunction do not apply to this case because Section 1415(e)(3) operates as an "automatic injunction." *Doe by Gonzales v. Maher,* 793 F.2d 1470, 1486 (9th Cir.1986), *aff'd in part and modi-*

*fied in part, Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Zvi D. by Shirley D. v. Ambach,* 694 F.2d 904, 906 (2d Cir.1982). Accordingly, if Section 1415(e)(3) applies, an injunction automatically issues.

of, need special education and related services." 20 U.S.C. § 1401(a)(1)(A).

## The Applicability of the Stay–Put Provision

"The language of Section 1415(e)(3) is unequivocal." *Honig v. Doe, supra,* 484 U.S. at 325, 108 S.Ct. at 605. During the pendency of the independent evaluation and Level I due process hearing initiated under the IDEA, unless the state or local educational agency and Rodiriecus' parents or guardian otherwise agree (which they have not), Rodiriecus "shall remain in the then current educational placement." 20 U.S.C. § 1415(e)(3).

■ IDEA and its accompanying regulations do not define the term "current educational placement." In the absence of a definition, the plain meaning of the language should be employed. *Central States, Southeast and Southwest Areas Pension Fund v. Bell Transit Co.,* 22 F.3d 706, 710 (7th Cir. 1994). The parties differ, however, as to the meaning of that language in these circumstances. Plaintiffs say it means the last placement in which Rodiriecus was receiving an education. According to defendants, Rodiriecus was suspended from school at the time he sought the protection of IDEA; accordingly, the suspension is the operable placement.

Other courts have construed this language to mean the last placement in which a student was receiving an education. *E.g., Thomas v. Cincinnati Bd. of Education,* 918 F.2d 618, 625 (6th Cir.1990):

> Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's

placement will be the one subject to the stayput provision. And where, as here, the dispute arises before any IEP has been implemented, the "current educational placement" will be the operative placement under which the child is actually receiving instruction at the time the dispute arises. Accord, *S–1 v. Turlington,* 635 F.2d 342, 347–48 (5th Cir.1981); *M.P. by D.P. v. Governing Board of Grossmont Union,* 858 F.Supp. 1044 (S.D.Cal.1994); *Doe v. Rockingham County School Board,* 658 F.Supp. 403 (W.D.Va.1987).[6]

Furthermore, the suspension in effect at the time plaintiffs sought an evaluation pursuant to IDEA was the ten-day suspension, not the expulsion. Although defendants were seeking to extend that period through their noticed expulsion proceedings, Rodiriecus had not yet had his expulsion hearing, and defendants had not yet expelled him, at the time he sought the protection of the Act. The difference between a ten-day suspension and the long-term exclusion sought by defendants is significant. A short-term suspension "does not carry the potential for total exclusion that Congress found so objectionable." *Honig v. Doe, supra,* 484 U.S. at 326 n. 8, 108 S.Ct. at 605 n. 8. For that reason, the Supreme Court has distinguished a ten-day suspension, which schools might utilize for disciplinary purposes, from an exclusion in excess of ten days, which it has held to be a prohibited change in placement. *See Honig v. Doe, supra,* 484 U.S. at 325–26 n. 8, 108 S.Ct. at 605 n. 8.

Defendants argue that this interpretation prevents school authorities from imposing necessary discipline in their schools and will hamper the educational opportunities of other students. The Supreme Court considered,

---

**6.** The cases upon which defendants rely are not inconsistent with this interpretation. Unlike the child in *Joshua B. v. New Trier Township High School District 203,* 770 F.Supp. 431, 434 (N.D.Ill.1991), who was placed by his parents at a private school outside the direction of public education authorities, Rodiriecus is enrolled in a public school. The court noted that the stay-put provision is intended to "protect the student from interruptions in his education." *Id.* The court in *Mrs. A.J. v. Special School District No. 1,* 478 F.Supp. 418, 432 n. 13 (D.Minn.1979), observed in a footnote that the stay-put provision

did not apply because the parent neither objected to the suspension of her child nor instituted a judicial or administrative proceeding as required by state regulations. The court also noted that the stay-put provision was not relevant because the temporary disciplinary measure of suspension did not change the student's educational placement. *Id.* In *Monahan v. Nebraska,* 491 F.Supp. 1074, 1089 (D.Neb.1980), *aff'd in part, vacated in part and remanded,* 645 F.2d 592 (8th Cir.1981), the court did not need to resolve the issue of the student's current educational placement because the parties agreed on placement.

and rejected, this argument in *Honig,* which involved students who had engaged in violence as well as theft. *Honig v. Doe, supra,* 484 U.S. at 313, 315, 323, 325, 108 S.Ct. at 598–99, 600, 604, 605. Accord, *M.P. by D.P. v. Governing Bd. of Grossmont Union, supra.* Defendants correctly argue that a student or his guardian may utilize the IDEA procedure simply to avoid justifiable discipline, without any basis for believing he has a disability. *See M.P. by D.P. v. Governing Bd. of Grossmont Union, supra,* 858 F.Supp. at 1047. However, school authorities are not without alternative remedies. The Supreme Court noted that in the case of a "truly dangerous child" the school district may seek the aid of the courts. *Honig v. Doe, supra,* 484 U.S. at 326, 108 S.Ct. at 605–06. No one argues that dangerousness is an issue in the present case. Rather, the concern here is the possible commission of additional thefts. But pending a determination of whether Rodiriecus has a disability as defined under the Act, and the implementation of an appropriate individualized educational program ("IEP") if he does, *see* 34 C.F.R. § 300.341, school authorities have alternative means, such as requiring that he have escorts between classes and that he leave the school at the end of the day, to prevent additional thefts. Defendants do not argue to the contrary.

Furthermore, a student who seeks an evaluation of a disability when he faces a suspension or expulsion may nonetheless have a disability within the meaning of the Act. As noted earlier, Congress concluded that many children with disabilities are excluded from school, probably often as a result of disciplinary problems that are caused by their disabilities. Indeed, the *Honig* Court cited Congressional statistics which revealed that more than 12 percent of the 8 million disabled children in 1975 were excluded from school and that 82 percent of children with emotional disabilities were not having their educational needs met. *Honig v. Doe, supra,* 484 U.S. at 309, 108 S.Ct. at 596–97. It would not be surprising that the precipitating event that would trigger a parent or guardian's awareness that a student had a right to an evaluation under IDEA, or that a serious problem in fact existed, would be the point at which a school began to attempt to exclude the student. But one of the purposes of IDEA was to prevent schools from excluding disabled students without providing the educational services they need. Congress could reasonably conclude that a student would be more likely to receive an evaluation for disability and appropriate educational services if a school could not exclude him for disciplinary reasons before the procedures required by IDEA were completed. To enable a potentially disabled student or his guardian to take advantage of IDEA to prevent expulsion may be perhaps one of the most compelling reasons for having the stay-put provision.

Defendants argue that, at the least, I should allow them to expel Rodiriecus unless I conclude that they either knew or should have known that he had a disability. No such condition is in the statute.[7] Furthermore, a court is not well placed to make this determination. It is somewhat ironic that defendants ask me to make this determination because defendants elsewhere argue, and I agree, that appropriate psychological and educational specialists, and not the court, should decide whether Rodiriecus has a dis-

7. In a supplemental brief filed after this court entered the temporary restraining order in this case, defendants refer to and attach an undated memorandum from the U.S. Department of Education on the subject of discipline of students with disabilities. In "Questions and Answers" addressed to "Chief State School Officers" from "Judith E. Heumann, Assistant Secretary, Office of Special Education and Rehabilitative Services," the memorandum states that a student requesting an evaluation after a disciplinary or expulsion process has begun does not obligate the school to reinstate the student's prior in-school status. To the extent this represents the current views of the U.S. Department of Education, I conclude that it is inconsistent with the language and purpose of the statute, which specifically states that it is applicable to "any proceedings conducted pursuant to this section," 20 U.S.C. § 1415(e)(3), as well as applicable judicial authority. The memorandum goes on to note that a court may enjoin the suspension or expulsion "if the court determines that the school district knew or reasonably should have known that the student is a student in need of special education." Memorandum, p. 10–11 n. 4. The memorandum cites no authority for its belief that a court must decide whether the school district ought to have known about the disability before issuing the injunction.

ability. It is difficult to see how I could determine that defendants should have known that Rodiriecus has a disability within the meaning of the Act without deciding that he is disabled (or the converse).

Nevertheless, contrary to defendants' stated beliefs, there does appear to be substantial evidence that Rodiriecus has a "serious emotional disturbance" and is therefore a child with a disability as defined in 20 U.S.C. § 1401(a)(1)(A). According to the reports and affidavit of his caseworker, Rodiriecus had been living in a residential facility under the guardianship of the Illinois Department of Children and Family Services for over one year during 1993 and 1994, where he had been placed after repeatedly coming under court supervision for misbehavior, including robbery. He had been involved in disturbances at his prior school, including a fight in which he reportedly attacked another student. At the facility where he resided under DCFS guardianship, he at times ran away, stole, and beat his head against a brick wall. In April, 1994, his guardian at the facility requested the Lake Villa, Illinois School district, where Rodiriecus was then attending school, to give him a comprehensive evaluation pursuant to IDEA, because of concern over whether his behavioral needs were interfering with his academic progress. (Apparently this evaluation was not completed, although the parties did not know the reason.)

Defendants say they had no knowledge of any of this. Even if they did not, they knew that he began the school year late at Abbott Middle School, that he had received numerous failing grades and incomplete grades during the short time he was there, and that the reports accompanying his grades indicated that he was missing assignments. He had also been suspended or sent to disciplinary alternative detention on several occasions during the short time he was at Abbott Middle School, amid teacher reports that he and his sister were very angry, that he was disrupting classes, and that he was unable to control himself. Defendants argue that this is normal behavior for students attending that school. If it is, there may be many children at Abbott Middle School who require an evaluation under IDEA. A record of four "Fs," a "D," and two incompletes in the period Rodiriecus had been at the school, coupled with the reports from teachers that he was unable to control himself and the various citations for misbehavior, suggest that this is not a student who is coping adequately with the demands of school or, in the language of the Act, "having a successful educational experience." 20 U.S.C. § 1400(b)(5).[8]

■ In summary, the language of IDEA is clear. While defendants are understandably upset with his behavior and its possible impact on the school, Rodiriecus is a 13–year–old child who appears to have serious problems which have persisted for a number of years. At least from the definition of an emotionally disturbed child adopted by Illinois (*see* note 8), he would appear to be the type of person Congress contemplated in enacting IDEA. Whether he is or not, there are alternatives to expulsion available to the defendants to alleviate the problems associated with his behavior during the evaluation and review process outlined by IDEA. I find that he is entitled to the benefit of the stay-put provision in Section 1415. Accordingly, a preliminary injunction will issue, prohibiting defendants, without the consent of Rodiriecus' mother or guardian, from changing his educational placement, namely Abbott Mid-

---

8. Illinois regulations define an "emotional disorder" as follows:

Behavior disorder/emotional disorder—The term means a condition exhibiting one or more of the following characteristics over an extended period of time and to a marked degree, which adversely affects educational performance, even after supportive assistance has been provided. The student must demonstrate an inability to learn which cannot be explained by intellectual, sensory, health, cultural, or linguistic factors; an inability to develop or maintain satisfactory interpersonal relationships with peers and adults; or inappropriate types of behavior or feelings under normal circumstances; or a general pervasive mood of anxiety, unhappiness, depression; or a tendency to develop physical symptoms or fears associated with personal or school problems.

23 I.A.C. 225.552; *see also* 34 C.F.R. § 300.7.

The question of whether defendants' definition complies with IDEA is not before me. (Defendants have not argued that they offered supportive services.)

dle School, pending the conclusion of the evaluation and due process proceedings required by IDEA.

### Conclusion

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted.